IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SIMEON DESHON STATEN, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION H-09-1838 |
| | § | |
| OFFICER ADAMS, *et al.*, | § | |
| Defendants. | § | |

OPINION ON PARTIAL DISMISSAL

While confined in the Texas Department of Criminal Justice-Correctional Institutions Division, plaintiff filed the pending civil rights suit pursuant to 42 U.S.C. § 1983, alleging that defendants City of Houston Police Officers Ted Adams, Anthony Hawkins, and Jeffrey Oliver violated the Fourth Amendment by using excessive force to arrest him.  (Docket Entry No.1).  After counsel was appointed, plaintiff filed his Fifth Amended Complaint, seeking relief from defendants Adams, Hawkins, and Oliver on a claim of excessive force and from the City of Houston for sanctioning the use of excessive force, inadequate training and screening of police officers, and alternatively for failing to adopt a policy precluding the use of excessive force.  (Docket Entry No.73-1, pages 3-5).  Defendants have filed a motion for summary judgment (Docket Entry No.85), to which plaintiff has filed a response.  (Docket Entry No.88).

For the reasons to follow, the Court will grant, in part, and deny, in part, defendants' motion for summary judgment.

I. BACKGROUND

Plaintiff alleges that the following events gave rise to the pending complaint:

> On or about October 8, 2008, Plaintiff was pulled over in his vehicle during a traffic stop by Officers Hawkins, Adams, and Oliver (collectively, the "Officers").  The Officers approached Plaintiff while Plaintiff was still in his vehicle, and without warning, began striking the

1

Plaintiff about the face as Plaintiff held his hands in plain view.  Plaintiff pleaded with the Officers to stop striking him, however, the Officers did not respond and continued to repeatedly strike Plaintiff.  Plaintiff was knocked unconscious by the blows from the Officers.  When Plaintiff regained consciousness, he found himself on the ground next to his vehicle being repeatedly kicked and stomped by the Officers.  At no time, did Plaintiff fail to comply with any commands given by the Officers, resist the Officers, strike or attempt to strike the Officers.

(Docket Entry No.73-1, pages 2-3).

The undisputed summary judgment record shows that Officer Adams observed plaintiff, who was driving a Chevy Impala, engaging in what he believed to be a drug transaction in the parking lot of an apartment complex.  (Docket Entries No.85-10, page 8; No.86, Exhibit N).  The car was owned by plaintiff's girlfriend, who was a passenger in the car.  (Docket Entry No.85-3, page 6).  Adams alerted officers in a marked vehicle of the possible drug transaction and followed the car in an unmarked city vehicle.  (Docket Entries No.85-10, page 9; No.86, Exhibit N).  Adams observed plaintiff make several traffic violations.  After plaintiff crossed three lanes of traffic, uniformed Officers Hawkins and Oliver, who were in a marked police vehicle, initiated a traffic stop by turning on their lights and siren.  (Docket Entries No.85-2, page 9; No.85-9, page 7).  Plaintiff, however, ran the traffic signal and refused to stop.  (Docket Entries No.85-2, pages 9-10).  During the ensuing chase, the officers observed purple liquid pouring out of the driver-side window onto the ground and the side of the vehicle.  (Docket Entries No.85-2, pages 9-10; No.85-3, page 13; No.85-10, pages 10-11).  Plaintiff then stopped the vehicle.  (Docket Entries No.85-2, pages 10-11; No.85-9, pages 7-9; No.85-10).

Plaintiff was forcibly removed from the car, taken to the ground, and handcuffed by the officers.  (Docket Entries No.85-2, page 10; 85-3, pages 7-8; 85-9, page 14; 85-10, page 12).  Adams called for an ambulance and a supervisor.  (Docket Entry No.85-10, page 14).  Shortly thereafter, paramedics arrived; they wiped blood from plaintiff's lips and eyes where the

concrete and rocks had cut him. (Docket Entry No.85-3, page 8). Plaintiff declined further treatment and transportation by paramedics to a local hospital. (*Id.*). After medical personnel at the Harris County Jail rejected his admittance because of his injuries, plaintiff was transported by other police officers to Ben Taub Hospital, where he informed medical personnel at the hospital that his mouth, jaw, and ribs hurt. (*Id.*, page 9). Medical personnel x-rayed or scanned his jaw and gave him Ibuprofen for pain. (*Id.*, pages 11-12.). They did not identify a problem with plaintiff's jaw but told him to return in two weeks or to follow up with a family doctor. (*Id.*, page 16). Plaintiff was then booked in the Harris County Jail.

Plaintiff entered a negotiated guilty plea to possession of cocaine and to tampering/fabricating evidence, namely codeine. (Docket Entry No.85-1). As part of the plea bargain, the State dropped charges against him for evading arrest. (Docket Entry No.85-3, page 17). He was convicted of the two charges and sentenced to concurrent sentences of three years confinement on October 10, 2008. (Docket Entry No.85-1). After his conviction, plaintiff remained in the Harris County Jail for a few months, where his jaw was x-rayed a second time. (Docket Entry No.85-3, page 16). Medical personnel at the Harris County Jail did not come up with any diagnosis but put plaintiff on a soft tissue diet for two weeks and administered pain medication. (*Id.*, pages 11, 16). Thereafter, plaintiff was transferred to a prison unit in Huntsville, where he requested medical treatment for his back, knees, neck, and head, and psychiatric treatment for his anger issues. (*Id.*, pages 13-14). Medical personnel administered pain medication but did not attempt to identify or treat his medical issues. (*Id.*, page 14). One doctor told him that he could have a "post-concussion" on his right side of his head. (*Id.*). Nine months after the arrest, plaintiff filed a complaint with the City of Houston Police Department's Internal Affairs Division. (Docket Entry No.85-4, page 5). The Division investigated and found

insufficient evidence to prove or disprove plaintiff's allegations against the three officers of excessive force.  (*Id.*).  On June 11, 2009, plaintiff filed the pending civil rights suit.  (Docket Entry No.1).

Plaintiff was transferred to a prison unit in Amarillo in August 2010, where he was placed on a waiting list to see an orthodontist about jaw surgery; he was given more x-rays and pain medication.  (Docket Entry No.85-3, pages 14-15).  No one ever told plaintiff that his jaw was broken but a doctor told him that his jaw might have been dislocated.  (*Id.*, page 16).

Plaintiff seeks compensatory and punitive damages.  (Docket Entry No.73-1, pages 5-6).

Defendants move for summary judgment on the following grounds:

1.    The individual police officers are entitled to qualified immunity because there is no evidence that the force used to arrest plaintiff was unreasonable and no evidence that plaintiff's constitutional rights were violated; and,

2.    The City of Houston is not liable for plaintiff's injuries because there is no evidence of a constitutional violation, no evidence that the arresting officers were inadequately trained, and no evidence that any municipal custom, policy, or practice was the moving force behind any constitutional injury allegedly suffered by plaintiff.

(Docket Entry No.85).

## II. DISCUSSION

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park,*

*Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).  The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant.  *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

### A. Police Officers

Qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 199-200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As public officials, Adams, Hawkins, and Oliver are entitled to qualified immunity on plaintiff's § 1983 excessive force claims unless plaintiff has "adduced sufficient evidence to raise a genuine issue of material fact suggesting [their] conduct violated an actual constitutional right," and the officers' "actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."  *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).  "Although qualified immunity is 'nominally an affirmative defense," the plaintiff bears a heightened burden "to negate the defense once properly raised."  *Newman v Guedry*, 703 F.3d 757, 761 (5th Cir. 2012).  Even so, on summary judgment, the Court must look to the evidence before it in the light most favorable to the plaintiff when conducting a qualified immunity inquiry.  *Id.* at 763.

The right to make an arrest necessarily carries with it the right to use some degree of force or threat to affect it.[1]  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  A claim of excessive force during the course of an arrest is analyzed under the Fourth Amendment and its reasonableness standard, which requires "two overlapping objective reasonableness inquiries." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009).  A constitutional violation occurs if the plaintiff demonstrates (1) an injury, (2) which "resulted directly and only from a use of force that was clearly excessive to the need," and (3) the force used was objectively unreasonable. *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).  Under the aforementioned qualified immunity analysis, the Court asks whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable.  *Lytle*, 560 F.3d at 410.  "The defendant's acts are held to be objectively reasonable unless all reasonable officers in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 457 (5th Cir. 2001).

To the extent possible, the Court evaluates each officer's actions separately. *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

<u>1. Claims against Oliver and Adams</u>

Plaintiff's amended complaint, filed by appointed counsel, alleges that all of the officers struck plaintiff without warning about the face as he held his hands in plain view and they continued to strike him even though he pleaded with them to stop.  (Docket Entry No.73-1, pages 2-3).  It also alleges that plaintiff was knocked unconscious by the blows and when he

---

[1] State law provides the following in pertinent part:  "A peace officer . . . is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or to prevent escape or assist in preventing escape after arrest."  TEX. PEN. CODE ANN. §9.51(a) (Vernon 2011).

regained consciousness, he was on the ground being kicked and stomped by the officers.  (*Id.*, page 3).  It further alleges that at no time did plaintiff fail to comply with any commands given by officers, resist officers, or strike or attempt to strike the officers.  (*Id.*).

In his deposition, however, plaintiff attests to the following:  After he stopped the vehicle, all three officers came to the driver's side window, which was rolled down.  Officers Adams and Oliver immediately came to the window of the car; Officer Hawkins was behind them; Oliver punched plaintiff and Adams hit plaintiff with Adams' gun through the open window of the car.  (Docket Entry No.85-3, pages 7, 16).  Although plaintiff had his hands up, the officers screamed, "Put your hands up."  (*Id.*).  Plaintiff told Officer Hawkins to make Oliver and Adams stop hitting him and "Officer Hawkins told them to stop or something" or hit them "and they stopped."  (*Id.*, pages 7, 12).  Plaintiff then blacked out and when he awoke, he was lying with his nose to the ground with Officer Adams standing on his head with one foot and kicking his arms out and kicking his ribs with the other foot.  (*Id.*, pages 7-8, 10).  At that time, plaintiff saw his girlfriend sitting on the grass; he did not know how she got out of the car and onto the pavement.  (*Id.*, page 8).

Contrary to his complaint, plaintiff attests that Officer Hawkins did not use any excessive force against him but allowed it to happen.  (*Id.*, page 12).

<u>a. Injuries Directly and Only from Use of Force</u>

To state a constitutional violation, plaintiff must first show that he suffered an injury, which resulted directly and only from the use of force that was excessive to the need.  *Flores*, 381 F.3d at 396.  A showing of a significant injury is no longer required in the context of an excessive force claim but a plaintiff asserting such a claim must have suffered more than a *de*

*minimis* injury, which the Court evaluates in the context in which the force was deployed. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).

Plaintiff's amended complaint alleges that he suffered "severe bodily injuries" but does not clearly identify the injuries that plaintiff allegedly suffered from Oliver punching plaintiff or from Adams striking plaintiff with his gun, standing on plaintiff's head, and kicking plaintiff in the ribs.  (Docket Entry No.73-1, page 3).   In response to the motion for summary judgment, plaintiff only alleges that when he regained consciousness, his head and mouth were bleeding and his ribs hurt.  (Docket Entry No.88, page 4).

However, in his deposition, plaintiff attests that he has suffered the following physical injuries attributable to the use of force in this case:

> My jaw, my head, the headaches I have, my back, my neck, my knees, the numbness in my hands and my – the pain in my hands and my – the numbness in my feet.  Like sometime I have like a burning, tearing sensation in my back or something.  My legs sometimes get numb, and when they come back, it's like a burning.

(Docket Entry No.85-3, page 17).  Plaintiff does not allege in his pleadings or deposition that after the incident, he suffered broken, cracked, or bruised ribs or bruises, cuts, scrapes, marks or injuries to his neck, back, shoulders, arms, hands, legs, or feet or that he was treated for the same.  Instead, plaintiff attests that immediately after the incident his eyes and lips were bloody from the cuts he incurred from the concrete and rocks.   (Docket Entry No.85-3, page 8).  Although he complained that his mouth, jaw, and ribs hurt, medical personnel at Ben Taub Hospital x-rayed only his jaw but did not identify a problem with the jaw.  (*Id.*, page 9).  A second x-ray of the jaw at the Harris County Jail sometime later did not result in a diagnosis. (*Id.*, page 16).  Medical personnel at the prison unit in Huntsville did not attempt to identify or treat his medical issues, although one doctor told him that he might have a "post-concussion" on

the right side of his head.  (*Id.*, page 14).  While incarcerated at a prison unit in Amarillo, plaintiff's hips, hands, back and jaw were x-rayed.  (*Id.*).  He was placed on a waiting list to see an orthodontist about jaw surgery because a doctor told him that because "by me being hit with the gun, that it knocked my jaw out of the rotator cuff or something, the cup that my jaw fits in."  (*Id.*, page 16).

Plaintiff has not attached copies of his medical records from any of the medical facilities where he sought treatment.  Two non-medical experts, who have viewed plaintiff's medical records, attest that plaintiff suffered no discernible injuries from the use of force other than a minor injury to his face.  (Docket Entries No.85-4, page 5; No.85-6, pages 5-6; No.88-5, pages 5-6).

Plaintiff attests that he was examined by medical personnel shortly before giving his deposition.  (Docket Entry No.85-3ocket Entry No.85-3, page 17).  Although the results of the examination are included in plaintiff's designation of expert testimony, plaintiff did not attach the Final Report to his response to the summary judgment motion.  (Docket Entry No.81-1).  Moreover, the Final Report does not indicate that plaintiff's injuries and medical conditions resulted directly and only from the alleged use of force by Adams and Oliver.[2]

The parties, however, agree that plaintiff had some blood on his face following the use of force.  (Docket Entries No.85-2, page 13; No.85-3, page 8; No.85-9, page 15; No.85-10, pages 13-14).  Officer Adams attests that plaintiff injured himself when he hit his head or chin on the payment more than once, which was hard enough to make him bleed.  (Docket Entry

---

[2] Plaintiff attached a copy of a medical report issued by Dr. Clark McKeever to his designation of expert witnesses, but not to his response to the motion for summary judgment.  Dr. McKeever, who is a board certified orthopedic surgeon, indicates in the Final Report that plaintiff's chief complaints are "[m]ultiple injuries with ongoing pain involving his jaw, neck, lower back, right hip, both knees, and both hands."  (Docket Entry No.81-1, page 2).  Dr. McKeever reports the findings from his examination and tests but does not attest to the origin or cause of plaintiff's condition or the findings of medical experts who previously treated plaintiff, even though he reports that he has plaintiff's medical records from the prison units where plaintiff was incarcerated.  (*Id.*).

No.85-10, page 13).  He attests that plaintiff might have hit hard enough to cause injury to his jaw by resisting the officers' attempt to cuff him while on the ground but denies the officers applied any force to the back of plaintiff's head or neck.  (*Id.*, page 14).  Adams called for an ambulance and a supervisor because plaintiff had been injured.  (*Id.*, page 14).  Plaintiff attests that he can't remember where the cuts to his mouth were; he just remembers that when he awoke on the ground his mouth was sore, he couldn't talk.  "It was hurting, bloody, super busted, swol [sic], so it hurt.  Like my teeth had went [sic] through my lip, so it was -- it hurt to talk." (Docket Entry No.85-3, page 8).  Paramedics wiped blood from plaintiff's lips and eyes where the concrete and rocks had cut him.  (*Id.*).

Viewing the record in plaintiff's favor, a reasonable jury could find that plaintiff suffered an injury to his mouth and possibly his jaw from the alleged use of force.  Plaintiff, however, provides no probative summary judgment evidence that his other extensive injuries resulted directly and only from the strikes to his face by Oliver's fist and Adams's gun or Adams's kick to his ribs.  *See Batiste v. Theriot*, 458 Fed. Appx. 351, 355 (5th Cir. 2012) (expert testimony did not show that injuries were direct result of tasing); *Ontiverso v. City of Rosenberg, Tex.*, 564 F.3d 379, 383 (5th Cir. 2009) (noting "at the summary judgment stage, we require evidence – not absolute proof, but not mere allegations either"); *Johnson v. Missouri City*, Civil Action No.H-07-1739, 2009 WL 6767109 *6 (S.D. Tex. Mar. 9, 2009) (no probative evidence that force caused injuries).

<u>b. Excessive to the Need and Objectively Unreasonable</u>

A claim of excessive force is fact-intensive; whether the force used was "clearly excessive" and " unreasonable" depends on the "facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.  Some relevant considerations include "the severity of the crime at

issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.*  As to the reasonableness inquiry, the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  An officer's use of force is evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396; *Hill v. Carroll Cnty*, 587 F.3d 230, 234 (5th Cir. 2009) (noting that "[t]he court must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts").  In applying this standard, courts are also directed to consider "the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

In gauging the objective reasonableness of the force used by a law enforcement officer, the Court must balance the amount of force used against the need for that force.  *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996).  "[T]he need for force determines how much force is constitutionally permissible."  *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).  The Court may consider "the seriousness of injury to determine whether the use of force could plausibly have been thought necessary.  *Deville v. Marcanel*, 567 F.3d 156 168 (5th Cir. 2009).

Whether Oliver's alleged fist punches and Adam's strikes with his gun to plaintiff's face through the window of plaintiff's vehicle were excessive to the need and clearly unreasonable, the record viewed in plaintiff's favor, but from the officers' perspective shows the following:  The officers had probable cause to fear for their safety at the time of the initial stop and after they approached the vehicle.  (Docket Entries No.85-6, page 4; No.88-5, page 4).  The

officers had given chase to an unknown person, whom they suspected had engaged in a drug transaction and was possibly disposing of the drugs; they feared that he might be armed and dangerous.[3]  (Docket Entries No.85-2, page 10; No.85-9, page 10; No.85-10, pages 10-11).

Plaintiff did not comply with orders to get out of the car.  The officers attest that before approaching the car, one officer issued commands over the patrol car's PA system for plaintiff to put his hands on the steering wheel where they could be seen.  (Docket Entries No.85-2, page 11, No.85-10, page 11).  Officers Oliver and Hawkins, however, could still see movement in the car.  (Docket Entries No.85-2, page 11).  The officers then commanded plaintiff to show his hands and to get out of the car.  (Docket Entries No.85-2, page 11; No.85-3, page 7; 85-9, page 14).  Plaintiff attests that he raised his hands inside the car,[4] but contrary to his complaint, plaintiff does not attest that he was compliant with other commands or that he offered no resistance.

Officer Oliver attests that he could see inside the car to chest level as he and Hawkins walked along side on the driver's side.  (Docket Entry No.85-9, page 10).  They were giving plaintiff commands to show his hands.  (*Id.*, page 11).  Although Officers Hawkins and Oliver disagree about the location of plaintiff's hands when they approached the vehicle,[5] all of the officers agree that plaintiff did not comply with orders to get out of the car.  (Docket Entries No.85-2, page 11; No.85-3, page 7; 85-9, page 14).  Likewise, plaintiff did not put his hands

---

[3] Hawkins viewed plaintiff as a threat because of what transpired during the pursuit and because plaintiff did not get out of the vehicle as commanded.  (Docket Entry No.85-2, pages 11-12).  Oliver attests that "where there's narcotics, there's guns."  (Docket Entry No.85-, page 10).

[4] Plaintiff attests that he put his hands up when he stopped and that Officers Adams and Oliver immediately approached the car, starting hitting him, and screamed for him to put his hands up.  (Docket Entry No.85-3, page 7).

[5] Hawkins attests that he could not recall where plaintiff's hands were when they approached the car but they were "probably on the steering wheel or on his lap" and "that's probably why we did get him out of the vehicle."  (Docket Entry No.85-2, page 12).  Oliver attests that plaintiff was "digging under the seat."  (Docket Entry No.85-9, page 13).

outside the car.  (Docket Entry No.85-2, page 16).  Plaintiff proffers nothing to refute testimony that the officers ordered him to get out of the vehicle or testimony that he did not comply with the order to exit the car.

The officers approached the car with their guns drawn.  (Docket Entries No.85-2, page 12; No.85-9, page 10; No.85-10, page 11).  The parties, however, dispute which officers initially approached plaintiff.  Plaintiff attests that Officers Oliver and Adams immediately approached the driver's side with Hawkins behind them and starting hitting him as they ordered him to hold his hands up.  (Docket Entry No.85-3, page 7).  The officers attest that Hawkins and Oliver, who were in uniform, approached the driver's side of the car[6] while Officer Adams got the passenger out and secured her.[7]  (Docket Entries No. 85-2, page 11, 85-9, page 12; No.85-10, page 11).  Once securing the passenger, Officer Adams observed that Hawkins and Oliver were having a "tough" time with plaintiff because he was "pulling away, not giving them his hands." (Docket Entry No.85-10, page 12).

The officers believed that they had to "take plaintiff to the ground to actually –to control him.  Cannot control him inside the vehicle."  (Docket Entry No.85-2, page 16).  Hawkins attests that either he or Oliver holstered his weapon and went to "hands" to remove plaintiff from the vehicle while the other officer covered for him; when they realized plaintiff was unarmed, the officer, most likely Oliver, holstered his weapon and assisted in removing

---

[6]  The un-refuted evidence shows that Adams and Oliver were in two different police cars; Adams was in an unmarked car and in plain clothes, and Oliver, who was Hawkins's partner, was in a marked patrol car and dressed in uniform.  (Docket Entries No.85-2, pages 6-7; No.85-9, pages 7, 9; No.85-10, page 11).  The marked car was parked behind plaintiff's vehicle and Adams's unmarked car was parked behind the marked patrol car.  (Docket Entry No.85-10, page 11).

[7][7] Oliver attests that he did not see how the passenger from the vehicle was removed.  (Docket Entry No.85-9, page 12).

plaintiff from the vehicle.  (Docket Entry No.85-2, page 12).  Plaintiff was still not responding to commands.  (*Id.*).

The parties also dispute whether plaintiff was struck by the officers.  Plaintiff attests that Oliver and Adams struck him on the face, as plaintiff cursed them, and that the officers stopped striking him when Hawkins commanded them to do so.  (Docket Entry No.85-3, pages 7, 12).  Oliver attests that he does not recall striking plaintiff with his fist but notes that if plaintiff were resisting, he possibly did.  (Docket Entry No.85-9, page 13).  Oliver also does not recall that he punched plaintiff's face, but he does not believe that he did because if he hits someone, it is normally on the side of the body to avoid breaking his fingers.  (*Id.*, page 15).  Adams denies striking plaintiff (Docket Entry No.85-10, page 16); he attests that he assisted the other two officers in physically removing plaintiff from the car by grabbing plaintiff's arms.  (Docket Entry No.85-10, page 12).  Hawkins did not see anyone strike plaintiff but he does not deny that someone may have struck him to force compliance with their commands.  (Docket Entry No.85-2, page 16).

The parties agree that plaintiff did not attempt to hit the officers or take a threatening posture toward them.  Hawkins attests that plaintiff was not fighting but resisting efforts to handcuff him by not following orders and snatching his hands away as the officers tried to cuff him.  (Docket Entry No.85-2, pages 12, 14).  Consequently, the officers perceived that they had to forcibly remove plaintiff from the car to control him.  (*Id.*, page 12).  Plaintiff proffers nothing to contravene testimony that he resisted orders to get out of the car and resisted efforts to cuff him by snatching his hands away.  Instead, he claims that after the officers stopped hitting him per Hawkins' order, he momentarily blacked out.  (Docket Entry No.85-3, page 7).

Plaintiff attests that he has no memory of being removed from the vehicle.  He does not dispute that he was forcibly removed from the vehicle by the three police officers.  (*Id.*).

The parties agree that plaintiff was not cuffed when he was first taken to the ground.  Plaintiff attests that he awoke face down with his arms away from his body, and Officer Adams standing on his head with one leg.  (*Id.*, pages 7, 8, 10).  Plaintiff was bleeding from his mouth and the left side of his head.  (*Id.*, page 7).  He alleges that Adams kicked him in the ribs and kicked his arms out.  (*Id.*, pages 9-10).  He states that Adams told him to put his head down and he cried, "My head is down."  (*Id.* page 10).

The officers attest that Hawkins and Oliver forcibly removed plaintiff from the vehicle and took him to the ground to gain leverage.  Adams assisted them in detaining and cuffing plaintiff who was resisting and being uncooperative.  No one observed anyone kick or hit plaintiff.[8]  (Docket Entries No.85-2, pages 12-15; No.85-9, pages 12-16; 85-10, pages 12-16).  Hawkins attests that he scuffled with plaintiff by trying to grab plaintiff's hands to cuff them while plaintiff snatched his hands away.  (Docket Entry No.85-2, page 14).  He attests that it took all three officers to get plaintiff's arms behind his back to cuff them.  (*Id.*, page 15).  Hawkins did not observe any injury or blood to plaintiff's face until after he was cuffed and detained on the ground.  (*Id.*, page 13).  He did not see anyone hit plaintiff's jaw.  (*Id.*, page 19).  Plaintiff does not refute testimony that he resisted efforts to cuff him while on the ground.

---

[8] Oliver attests that he or Hawkins removed plaintiff from the car; he does not think that Officer Adams assisted them.  (Docket Entry No.85-9, pages 12, 13).  He does not remember who removed plaintiff from the car but remembers plaintiff being on the ground and refusing to cooperate.  (*Id.*, page 14).  Plaintiff was not cuffed when first placed on the ground and the officers had difficulty getting his hands in a position to handcuff him.  (*Id.*, page 16).  Adams eventually came and assisted with the detention.  (*Id.*, page 12).  It took all three officers to detain plaintiff.  (*Id.*, page 17).  Oliver attests that he did not see anyone kick plaintiff.  (*Id.*, page 16).

Adams attests that he saw that Hawkins and Oliver were having difficulty cuffing plaintiff because he was not cooperating.  (Docket Entry No.85-10, page 12).  He thinks he helped the officers bring plaintiff out of the car, take plaintiff to the ground and handcuff him.  (*Id.*).  Adams grabbed plaintiff's arms.  (*Id.*).  He does not recall how plaintiff was removed because the scene was chaotic.  (*Id.*).

Adams attests that plaintiff injured himself when he hit his head on the pavement more than once because he refused to cooperate and the officers could not gently place him on the ground. (Docket Entry No.85-10, page 13). Adams attests that plaintiff refused to give the officers his hands. (*Id.*). Adams attests plaintiff hit hard enough to make him bleed but "there was no force being applied to . . . the back of his head or his neck. (*Id.*, pages 13-14). The officers had plaintiff by his arms and shoulders. (*Id.*, page 14). Adams did not strike plaintiff and he did not see anyone strike plaintiff. (*Id.*, page 16).

Defendants further contend that the physical evidence does not support claims that plaintiff was hit in the face or kicked on the ground. (Docket Entry No.85, pages 12-13). Defendants' expert, Assistant Chief George T. Buenik, attests as follows, in pertinent part:

> The various medical records from three different institutions each concluded that Mr. Staten suffered no discernible injury. Furthermore, the inmate photo that was taken of Mr. Staten on October 9, 2008, at 0000 hours at the Central Jail, does not depict any visible injuries to Mr. Staten's person. Therefore, based on the provided evidence, the amount of force that Mr. Staten alleges that he received by his arresting officers is not supported by the provided medical records and/or jail photos.

(Docket Entry No.85-4, page 5). Another expert, Senior Officer Terry Bratton, attests that based on jail records, he found no evidence to support plaintiff's claim that he was hit in the face by an officer with a firearm. (Docket Entry No.85-5, page 5).

Keith A. Howse, plaintiff's legal expert, notes that "[m]inor injuries to a suspect can and do occur when a police officer uses force, even reasonable force, on a suspect who is resisting." (Docket Entries No.85-6, page 5; No. 88-5, page 5). Howse, who has reviewed plaintiff's medical records, indicates that the injuries to plaintiff's mouth "are certainly consistent with the kind of incidental injury that can occur when a suspect is forcibly taken down to the ground during apprehension." Howse also opines that the injuries are equally consistent

with a situation where an officer could have used excessive force.  For instance, being struck by an object of some sort, including a handgun."  (*Id.*).  In summary, he concludes that "[t]he facial injuries to Mr. Staten are as consistent with those associated with reasonable force as they are with those that can be caused by excessive force."  (Docket Entries No.85-6, page 11; No. 88-5, page 11).  Howse notes that according to plaintiff's testimony, he might have also suffered a jaw injury.  (Docket Entries No.85-6, page 6; No.88-5, page 6).

Plaintiff's expert Howse further attests that if plaintiff was still resisting the officers while on the ground, "reasonable force such as pain compliance strikes to certain nerves in the arms and legs may appear to a bystander that officers are simply beating a suspect for no reason when in reality the strikes are intended to distract and/or briefly incapacitate the suspect in order to get him handcuffed."  (Docket Entries No.85-6, page 6; No.88-5, page 6).  Officer Hawkins attests pain compliance "is using the force necessary to make an effective arrest," which might involve hitting someone in the face, and that plaintiff was possibly one of those suspects that required to feel a little pain before he could comply.  (Docket Entry No.85-2, page 19).

In short, the facts the officers allege to have perceived were as follows:  A suspected drug offender and traffic violator who had forced them to give chase, resisted their orders to get out of the car and their efforts to cuff him through the window of the car.  They assumed he was dangerous and armed.  Even though plaintiff did not strike or threaten them, he resisted their efforts to detain him by snatching his hands away and disobeying orders to get out of the car; consequently, the officers scuffled with him.  Although he does not recall anyone hitting or kicking plaintiff, Officer Hawkins attests that that such force may have been used to

gain leverage over plaintiff and make an effective arrest.[9]  The officers did not observe that plaintiff suffered a serious injury from the use of force; plaintiff was treated by paramedics and refused further treatment.  Plaintiff's injuries to his face, *i.e.*, the bloody face and lip, were consistent with the use of reasonable force.  *Compare Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009) (pushing suspect, who was resisting arrest, to hood of car, which resulted in bruising, was not excessive under the circumstances).  Plaintiff provides no probative summary judgment evidence that shows that he suffered discernible injuries to his ribs, back, hands, chest, or legs.

Based on the foregoing, the Court finds that were a jury to consider the undisputed facts and un-refuted evidence in this record, it would conclude that neither Hawkins nor Oliver violated plaintiff's constitutional right to be free from unreasonable seizure under the Fourth Amendment even if Oliver hit plaintiff with his fist in the face.  Plaintiff was not compliant with orders to get out of the car and to be cuffed.  Oliver was attempting to restrain plaintiff in close quarters through the car window along with another officer.  The officers could not control plaintiff while he was seated in the car.  Given such close quarters, Oliver may have struck plaintiff on the face, the only area accessible while plaintiff was seated in the car, to force compliance and to assist in removing plaintiff from the vehicle.  Accordingly, defendants Hawkins and Oliver are entitled to qualified immunity.

---

[9] Hawkins attests, as follows in pertinent part:

> [W]e got three people trying to get him to get his hands behind his back.  And at that point there when he's not complying and you tell him to—you give him a verbal command and also the officers are trying to help him get his hands back and he's not doing it, I say any force—any force put on him is necessary to make that arrest, yeah, I agree to that.  But as far as saying, no, I don't think nobody should have hit him, I can't say that. . . . Because actually, if upon approach of the vehicle, if he had his arms out of – poke his hands out the car, he's arrest [sic], we probably wouldn't have taken him to the ground.

(Docket Entry No.85-2, page 16).

Likewise, a jury would also conclude from the undisputed facts and un-refuted evidence that Officer Adams did not violate plaintiff's Fourth Amendment right with respect to his conduct in attempting to force plaintiff to submit to handcuffs.  Plaintiff resisted efforts to cuff him while on the ground.  Given the lack of evidence showing discernible injuries to his arms, legs, ribs, back, or hands, a reasonable jury could find that Adams's alleged kicks to plaintiff's ribs was reasonable to force compliance and allow the officers to cuff him.  Adams, therefore, is also entitled to qualified immunity on such claim.

However, were a jury to accept plaintiff's version of the facts that Officer Adams pistol-whipped plaintiff while plaintiff was sitting in the car with his hands up, it could conclude that such force was excessive and unreasonable to the need, even if plaintiff had failed to comply with orders to get out of the car and snatched his hands away as the officers attempted to cuff him.  By all accounts, the allegedly uncooperative plaintiff did not threaten or strike the officers and by at least one account, plaintiff's injuries to his face were consistent with force expended by striking his face with a gun.  Officer Adams attests that an officer may use an intermediate weapon such as a nightstick to force compliance and that there may be a situation where striking a suspect on the face is acceptable force.  (Docket Entry No.85-10, pages 20-21).  He agreed, however, that striking plaintiff on the face that day would have been unreasonable and unnecessary."  (*Id.*, page 21).  Determination of the objective reasonableness of Officer Adams conduct, therefore, requires this Court to "settl[e] on a coherent view of what happened in the first place."  *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994) (internal citation and quotation omitted).  Accordingly, Officer Adams is not entitled to qualified immunity on plaintiff's claim that Adams pistol-whipped him during the arrest.

<u>2. Officer Hawkins</u>

Although plaintiff alleges in his Fifth Amended Complaint that Hawkins, Adams, and Oliver used excessive force against him (Docket Entry No.73-1, page 3), plaintiff attests that Hawkins did not use excessive force against him.  (Docket Entry No.85-3, page 12).  In response, plaintiff alleges that his deposition testimony establishes that Officer Hawkins witnessed Adams and Oliver hit plaintiff in the face, throw him to the pavement, kick him, and Adams pistol whip plaintiff and Hawkins allowed "it to continue."  (Docket Entry No.88, pages 1, 9-10).

An officer may be liable under § 1983, under a theory of bystander liability, if he (1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent harm, and (3) chooses not to act.  *Randall v. Prince George's Cty., Md.,* 302 F.3d 188, 203-04 (4th Cir. 2002); *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  Plaintiff, however, does not assert a claim of bystander liability against Hawkins, as he did in previously filed *pro se* complaints, nor does plaintiff incorporate the allegation of bystander liability, which was raised in his previously filed complaints.  "Ordinarily, an amended complaint supersedes an original complaint and renders it of no legal effect 'unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading.'" *Ruiz v. El Paso Processing Ctr.*, 299 Fed. Appx. 369, 370 (5th Cir. 2008) (quoting *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).  Instead, plaintiff raises the issue of bystander liability in his response to defendants' motion for summary judgment.  "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Board of Sup'rs of Louisiana State University*, 429 F.3d 108, 113 (5th Cir. 2005).

Even if such claim were before the Court, plaintiff fails to overcome Hawkins's defense of qualified immunity because plaintiff's deposition testimony shows that Hawkins took action to stop the alleged force.  Plaintiff twice attests that he told Officer Hawkins to make Oliver and Adams stop hitting him and "Officer Hawkins told them to stop or something" or hit them "and they stopped."  (Docket Entry No.85-3, pages 7, 12).  Plaintiff attests that he knew Officer Hawkins all of his life because Hawkins worked security at the apartments where plaintiff lived.[10]  (*Id.*, page 12).  Plaintiff attests that he knew Hawkins's name and "that's how I got those officers off of me."  (*Id.*).

With respect to removing plaintiff from the vehicle and taking him to the ground, plaintiff attests that he has no memory because he blacked out; he attests that he awoke to being flat on the ground facing down with his arms away from his body, with Officer Adams standing on his head with one leg and kicking his arms out with the other.  (Docket Entry No.85-3, pages 7, 8, 10).  The record is void of evidence that Officer Hawkins observed or had knowledge of Adams's alleged misconduct in that chaotic moment.  Hawkins attests that he had tunnel vision during the scuffle to cuff plaintiff outside the car, *i.e.,* he only saw what he was doing at that

---

[10] Officer Hawkins attests that he knew plaintiff as a child from his work at as a security officer in the apartment complex where plaintiff lived.  (Docket Entry No.85-2, pages 7-8).  Plaintiff had moved from the complex when he was a juvenile and Hawkins had had no contact with plaintiff or his mother since then.  (*Id.*, page 8).  Hawkins attests that once plaintiff was cuffed, he went to check on the passenger, who was sitting by herself.  (*Id.*).  At that time, plaintiff addressed Hawkins specifically as someone he knew and recognized after plaintiff was cuffed, as follows, in pertinent part:

> [Plaintiff] said: Hawkins, it's me.  And I'm wondering 'it's me'?  You know, like I said, a lot of – a lot of the people in the area.  I've been in the area for 22 years.  A lot of people know in that area ask that.  But as far as who he was at that time, I didn't know he was.  Then he said, this is Shon.  By that time, I was over where the girlfriend was, looking back across the car where he was.  And I kind of recollect that's who he was.

(*Id.*, page 13).  Hawkins attests that he had no further dealings with plaintiff because he was aware that plaintiff knew him and he knew plaintiff and he did not want to have any conflict with the arrest.  (*Id.*, page 18).  Hawkins attests that plaintiff called for him a few times to come but he did not go and did not communicate with plaintiff.  (*Id.*).  Plaintiff, however, attests that Hawkins walked him to the patrol car after he was cuffed while they waited for the ambulance.  (Docket Entry No.85-3, page 8).

particular point.   (Docket Entry No.85-2, page 14).   Without probative summary judgment evidence, plaintiff fails to raise a genuine issue of material fact that would give rise to an actionable claim of bystander liability.

Accordingly, Officer Hawkins is entitled to qualified immunity on plaintiff's claims of excessive force and bystander liability.

## B. Municipal Liability

In his Fifth Amended Complaint, plaintiff claims the City of Houston is liable because it sanctioned the use of excessive force by officers during an arrest, it provided inadequate training and screening of its police officers with respect to the assaulting or beating of its citizens, and alternatively, it has failed to adopt a policy precluding officers from assaulting and beating citizens and for the ratification of such actions.   (Docket Entry No.73-1, pages 4-5). However, in his deposition, plaintiff negated his claims against the City of Houston.   Plaintiff attests that he is not alleging that a custom, practice, or policy of the City of Houston violated his rights, or that some City of Houston police officers were inadequately trained, should not have been hired or were inadequately screened.   (Docket Entry No.85-3, pages 10-11).   Instead, plaintiff attests that the City of Houston violated his civil rights because "[t]hese officers, they work for the City."   (*Id.*, page 11).

The City of Houston moves for summary judgment on grounds that the record is void of evidence of a violation of any constitutional rights, that the officers were inadequately trained, or that any custom, policy, or practice of the City of Houston was the moving force behind any constitutional injury suffered by plaintiff.   (Docket Entry No. 85, page 4).   In response, plaintiff contends that the City of Houston's pain compliance policy violated his rights

because it includes hitting suspects in the head, even when there was no immediate danger to the officers' lives.  (Docket Entry No.88, page 10).

1. Policy, Custom, Practice

"A municipality is almost never liable for an isolated unconstitutional act on the part of an employee." *Peterson v. City of Fort Worth, Tex.,* 588 F.3d 838, 847 (5th Cir. 2009). "Municipal liability for civil rights violations under Section 1983 is based on causation rather than *respondeat superior*." *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008).  When a municipal actor executes a government's policy or custom that inflicts a constitutional injury, the municipality as an entity may bear responsibility under § 1983.  *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978).  In the absence of a constitutional violation, the question of municipal liability is moot. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Because a reasonable jury could find from this record the absence of a constitutional violation by all of the officers, except Officer Adams's alleged use of force in pistol-whipping plaintiff, the question of municipal liability against the City of Houston for the conduct of these officers, save Adams, is moot.  Even if such claims were not moot, plaintiff attests that he seeks relief from the City of Houston on the basis of *respondeat superior*, which is not actionable under § 1983.

"To establish municipal liability under § 1983 with respect to his claim against Officer Adams,  plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson,* 588 F.3d at 847.  Official policy "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.*

(internal quotation marks omitted).  "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010).

In this case, plaintiff does not name a specific party with final policymaking authority over the City of Houston Police Department; instead, he alleges "a persistent and widespread practice of city employees – namely police officers –that, although not authorized by officially adopted policy, is so common and well settled as to constitute a custom that fairly represents official municipal policy."  (Docket Entry No.73-1, page 4).  Plaintiff, however, proffers no summary judgment evidence that would demonstrate that the City of Houston acknowledged or accepted the use of excessive force against its citizens.

In his response to the motion for summary judgment, plaintiff contends that the City of Houston's pain compliance policy violates his constitutional rights because "it includes hitting a suspect in the face, even where there is no immediate danger to the police officers' lives."  (Docket Entry No.88, page 10).  Plaintiff bases his allegation of a custom or policy of pain compliance on the testimony of Officer Hawkins, who attests to a Houston Police Department policy of pain compliance, in which the officer gives pain compliance, *i.e.*, inflicts pain to force compliance, along with a verbal command to make the suspect comply.  (Docket Entry No.85-2, page 19).  Hawkins did not know where such policy could be found but speculated that it was in the General Orders somewhere.  (*Id.*).  Hawkins opined that "pain compliance is using the force necessary to make effective arrest."  (*Id.*).  He agreed that such force might include hitting someone in the face if they were not complying.  (*Id.*).

The summary judgment record does not show that the City of Houston Police Department has a formal pain compliance policy or that some custom or practice was the moving force of plaintiff's alleged constitutional violation. Defendants' expert, Assistant Chief George T. Buenik, attests that the General Orders are the written orders establishing policies and procedures of the City of Houston Police Department. (Docket Entry No.85-4, page 4). They are created and written by department content experts at the directive of the Chief of Police, who is the policy maker, and are approved by the same. (*Id.*). The primary General Order relating to use of force is General Order 600-17, Use of Force, which states the following in pertinent part: "When dealing with citizens, suspects, and prisoners, employees will limit their physical contact to only the amount reasonably necessary to protect themselves or others, to affect an arrest, or to bring an incident under control." (Docket Entries No.85-4, page 8; No.85-5, page 4; No.85-7). General Order 500-01 provides that "officers are to use only that amount of force necessary to affect an arrest or protect themselves or others." (Docket Entry No.85-5, page 4). Likewise, General Order 500-20 provides that "officers are to refrain from unnecessary physical contact with prisoners." (*Id.*).

Plaintiff's expert Howse attests that "[p]ain compliance . . . [is] a technique that is designed to cause momentary pain to a non-compliant subject in order, for example, to place handcuffs on the person, or perhaps to distract the subject while the officer gains a position of advantage over the subject." (Docket Entries No.85-6, page 9; No.88-5, page 9). Howse indicates that such technique is a commonly taught to law enforcement officers across the country. (*Id.*).

Officer Adams attests that he is unsure if the Houston Police Department has a written policy regarding pain compliance because he has never personally read it. (Docket Entry

No.85-10, page 20).  He further attests that he has never heard the term "pain compliance" in connection with his employment except perhaps in connection with physical tactics.  (*Id.*).  He attests that during his training in handcuffing, he was taught to apply pressure to an individual who resisted cuffing.  (*Id.*).  Adams agrees that pain compliance does not involve the indiscriminate use of force to get a suspect to comply; he also agrees that striking a suspect on the face might be acceptable in accordance with Houston Police Department policy if "the suspect has you on the ground and the only thing that you have exposed is his face."  (*Id.*, page 21).

The record shows that the General Orders do not specifically address pain compliance or any other a technique for making an effective arrest.  (Docket Entries No.85-3, page 19; No.85-5, page 5).  Defendants' expert Terry Bratton attests that "[w]hen you have a scene that develops that quickly and that unexpectedly, an officer is entitled to consider all possibilities."  (Docket Entry No.85-5, page 5).  He also attests that if, under the circumstances alleged, plaintiff "was hit in the face by an officer with that officer's firearm," then such "officer would not be acting within HPD policy or within his training."  (*Id.*).

Based on this record, plaintiff fails to show that the City of Houston has a policy regarding "pain compliance" that was the moving force of plaintiff's alleged constitutional violation from Officer Adams's striking him on the face with a gun that would give rise to municipal liability against the City of Houston.

To the extent that plaintiff claims that the City of Houston Police Department sanctioned the Adams's conduct, a municipality may be held liable only for "acts which the municipality has officially sanctioned or ordered."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  In this case, the

record is void of any official sanction or order.  Defendants' other expert, Assistant Chief Buenik, opines that the Houston Police Department does not have any policy or practice or approval of the use of excessive force and to insure that the use of force is reasonable and necessary, the Department has a formal, structured system of investigation, which serves to hold officers accountable.  (Docket Entry No.85-4, pages 7-8).  The summary judgment record shows that an internal affairs investigation was conducted after plaintiff filed a formal complaint against the officers nine months after his arrest, the result of which proved insufficient to support plaintiff's allegations of excessive force. [11]  (*Id.* pages 4-5).  Plaintiff proffers nothing to refute this record or to show that the investigation was not thorough or valid.  Without more, plaintiff fails to show a genuine issue of material fact giving rise to a claim against the City of Houston with respect to the Houston Police Department's policies or lack of policies on the use of force.

## 2. Inadequate Training and Screening

Failure to train may be a "policy" for purposes of municipal liability under § 1983, but only when it "reflects a 'deliberate' or 'conscious' choice by a municipality."  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Municipalities are not normally liable for inadequate training, but failure to properly train may be a "policy" if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

---

[11] Both of defendants' experts opine that the use of force by all officers in this case was reasonable. (Docket Entries No.85-4, page 9; No.85-5, page 4).   To the extent that such opinions represent the City of Houston Police Department or its policy maker, the Court notes that "[g]ood faith statements made in defending complaint against municipal employees do not demonstrate ratification." *Zarnow v. City of Wichita Falls, Tex.*  614 F.3d 161, 169 (5th Cir. 2010).  "A 'policy maker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality.'"  *Id.* quoting *Peterson v. City of Fort Worth, Tex.* 588 F.3d 838, 852 (5th Cir. 2009)).

*Id.* at 390.   A claim for failure to train requires proof that: (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the violations in question. *See Zarnow*, 614 F.3d at 171.   Deliberate indifference is a very stringent standard, requiring the plaintiff demonstrate proof "that a municipal actor disregarded a known or obvious consequence of his action."  *Brown v. Bryan County, OK*, 219 F.3d 450, 457 (5th Cir. 2000).

Very difficult, though not impossible, a showing of deliberate indifference may also be made on a single incident.  *See Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).   The plaintiff must establish a pattern of conduct to show deliberate indifference related to a failure to train claim.  *Id.*   The plaintiff must show "'at least a pattern of similar incidents in which the citizens were injured . . . to establish the official policy requisite to municipal liability under section 1983.'" *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (quoting *Rodriguez v. Avita*, 871 F.2d 552, 554–55 (5th Cir. 1989)); *see also Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010) (normally the plaintiff must show a pattern of similar violations, and when it involves excessive force, the prior actions must have involved injury to a third-party).   "The 'single incident exception' is narrow and to rely on the exception 'a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation.'"  *Sanders-Burns*, 594 F.3d at 381 (quoting *Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 n. 34 (5th Cir. 2005).

Defendants' summary judgment evidence shows that all of the officers completed the Houston Police Department Academy and that they were certified as police officers by the Texas Commission on Law Enforcement Officer Standards and Education.   (Docket Entries

No.85-4, page 6-7; No.85-5, page 3; No.86).  "[W]hen police officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate.  *Id.*, at 381-82.  Plaintiff does not allege that the state requirements are inadequate.

Plaintiff's expert affirms that "[p]ain compliance training is a common training program that law enforcement officers across the country receive as a technique that is designed to cause momentary pain to a non-compliant subject in order, for example, to place handcuffs on the person, or perhaps to distract the subject while the officer gains a position of advantage over the subject."  (Docket Entries No.85-6, page 9; No.88-5, page 9).  Expert Howse opines that if the City of Houston Police Department "is teaching police officers to routinely hit or strike suspects in the face or head to simply seek compliance, then such practice would be unreasonable, dangerous, and inconsistent with established law enforcement policies."  (Docket Entries No.85-6, page 10; No.88-5, page 10).  Neither defendants' nor plaintiff's summary judgment evidence shows that such a practice is taught by the City of Houston Police Department.  (Docket Entry No.85-5).

Plaintiff makes no showing of a pattern of similar constitutional violations resulting in injuries, which occurred before the incident at issue, sufficient to demonstrate deliberate indifference.  Nor are plaintiff's allegations sufficient to state a claim under the very narrow "single incident exception."  Therefore, plaintiff fails to establish a genuine issue of material fact as to deliberate indifference with respect to training.  *See City of Canton*, 489 U.S. at 389.

Accordingly, defendants are entitled to summary judgment on plaintiff's claims against the City of Houston.

<u>III. CONCLUSION</u>

Based on the foregoing, the Court ENTERS the following ORDERS:

1.      Defendants' motion for summary judgment is GRANTED, in part, and DENIED, in part.  Defendants' motion for summary judgment is GRANTED with respect to all of plaintiff claims against the City of Houston, and Officers Anthony Hawkins and Jeffrey Oliver, and with respect to plaintiff's claim against Officer Ted Adams for excessive force while detaining plaintiff on the ground. Such claims are DISMISSED WITH PREJUDICE.  Defendants' motion for summary judgment is DENIED with respect to plaintiff's claim against Officer Ted Adams for excessive force by pistol-whipping plaintiff while plaintiff was seated in the car. Such claim is RETAINED.  An order setting a date for mediation before Magistrate Judge Frances Stacy, as agreed by the parties, will be forthcoming in a separate order.

2.      All other pending motions, if any, are DENIED.

The Clerk shall provide a copy of this Order to the parties.


SIGNED at Houston, Texas, this 8th day of April, 2013.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE